**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,　　　　)<br>　　　　　　　　　　　　　　　　)<br>　　　　　　　　Plaintiffs,　　　　)<br>　　vs.　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>DAYTON FAMILY PRODUCTIONS, *et*<br>*al.*,　　　　　　　　　　　　　)<br>　　　　　　　　Defendants.　　　)<br>_____) | Case No.: **2:97-cv-00750-GMN-VCF**<br><br>**FINDINGS OF FACT AND**<br>**CONCLUSIONS OF LAW** |

I.　　**FINDINGS OF FACT**

　　　1.　On October 1, 1998, the Court filed an Order for Permanent Injunction (the "Order"), based on a stipulated agreement between Glen E. Burke ("Burke"), the other defendants, and Plaintiff Federal Trade Commission ("FTC") resolving the FTC's charges, which alleged violations of Federal Trade Commission Act, 15 U.S.C. § 45(a) and the FTC's Telemarketing Sales Rule, 16 C.F.R. Part 310. (Compl. ¶¶ 21–27, ECF No. 1); (Order, ECF No. 122).

　　　2.　The Order prohibited Burke, *inter alia*, from "misrepresenting, in any manner, directly or by implication, or failing to disclose any fact material to a consumer's decision to purchase any item, product, good, service, or investment." (Order 5:1–21, ECF No. 122).  He was further enjoined from "[a]ssisting others in violating" the provisions of the injunction. (*Id.* at 5:22).  Assisting others is defined as:

> knowingly providing any of the following goods or services to any person or entity (1) performing customer service functions for an entity including, but not limited to, receiving or responding to consumer complaints; (2) formulating or providing, or arranging for the formulation or provision of any telephone sales script or any other marketing material for an entity; (3) providing names of, or assisting in the generation of, potential customers for an entity; or (4) performing marketing services of any kind for an entity.
> (*Id.* at 4:9–15).

3.  Burke stipulated to and signed the Order. (*Id.* at p. 16).  Further, Burke admits that he is bound by the Order. (Def.'s Opp'n to Pl.'s Mot. for Contempt 2, ECF No. 185).

4.  Burke managed a direct-mail sweepstakes operation in Nevada that sent consumers fliers offering cash prizes and payouts. ( *See infra* ¶¶ 5–60).

5.  Some of the operation's activities took place at 2451 S. Buffalo Drive in Las Vegas, NV, where Burke had his personal office.  (Supp. Exs. in Support of Pl.'s Mots. For Prelim. Inj. & Contempt ("Pl. Supp. Exs.") ¶¶ 4, 11, 14, ECF No. 179-11) (FTC investigator describes Burke's office and sweepstakes documents found there); (Pl. Supp. Exs. 17:2–18:2, 19:11–25, ECF No. 179-2) (sweepstakes employee picked up checks and claim forms at 2451 S. Buffalo Drive); (Exs. in Support of Pl.'s Mot. for TRO and Contempt ("Pl. Ex. Supporting TRO-Contempt") 35–72, ECF No. 155-3) (Department of Homeland Security investigative report detailing interception of sweepstakes forms and checks mailed from Mexico to 2451 S. Buffalo Drive).

6.  The sweepstakes operation also had an office at 3230 S. Buffalo Drive in Las Vegas, NV.  ( Pl. Supp. Exs. ¶¶ 15-16, ECF No. 179-11) (FTC investigator describes sweepstakes documents found there); (Pl. Supp. Exs. 8:17-25, 15:4-16, ECF No. 179-2) (sweepstakes employee worked at 3230 S. Buffalo Drive).

7.  The sweepstakes operation's mailers advertised payouts worth hundreds of thousands or even millions of dollars in "cash prizes," "sweepstakes payments," or other "unclaimed" or "unawarded" funds. (Pl. Exs. in Support of Pl.'s Mots. For Contempt ("Pl. Exs.") 22–30, ECF No. 170-3) (mailers and response cards); (Pl. Supp. Exs., ECF Nos. 170-5, 170-6, 170-7, 170-8); (*see also* Pl. Supp. Exs. ¶¶ 14, 16, ECF No. 179-11) (FTC investigator describes finding the mailers and response cards at Burke's offices).

8. Representative claims made in the operation's mailers include:

Our office has issued this Certified Letter to your immediate attention regarding money due you from our current award distribution and to make available to you as a

CASH AWARD WINNER the mandatory & requisite data for proper filing and claim to total disbursement awards now in excess of TWO MILLION DOLLARS. … By authority granted to me as Director of Financial Compliance, I am prepared to have Mr. Rowe, our Chief Payment Officer, send you a check for cash, and upon your timely filing and remittance, the mandatory and requisite data for your claim(s) to sponsored sweepstakes awards now totaling: $2,036,444.88. I cannot stress strongly enough the immediacy of this notice, and how important it is that you gain access to the vast amount of money referenced above. (Pl. Exs. 6, ECF No. 170-5).

Attention: [consumer name], you have been assigned Folio #70036625460 with regards to unclaimed funds exceeding $75,000,000.00. … The monies may be from a variety of sources, and may have been "lost" to you for over 20 years. It is with great anticipation that we have prepared this information – $75,000,000.00 is a substantial sum. (*Id.* at 10).

PLEASE BE ADVISED THAT THIS IS YOUR OFFICIAL NOTIFICATION OF UNAWARDED FUNDS CURRENTLY TOTALLING THE AMOUNT OVER: THE SUM $7,041,846.00. A bank check for an undisclosed amount has been approved for payment to [consumer name] at [address] in [city, state]. Check shall be delivered via uniformed courier and shall require signature over $5,000. (*Id.* at 9).

Congratulations, [consumer name]. If you can properly identify yourself with government issued picture identification (required for cash award incentives of $5,000 or more) as the [consumer name] of [city, state] – your bank check for an undisclosed amount is approved for immediate disbursement – the money is yours! The maximum cash allotment is $10,000. (Pl. Exs. 16, ECF No. 170-6).

9.  The mailers directed recipients to send back administrative "fees" to claim their benefits. (Pl. Exs. 22–30, ECF No. 170-3); (*see also* Pl. Exs., ECF Nos. 170-5, 170-6, 170-7, 170-8).

10.  The text of the mailers conveyed great urgency to respond. (*See, e.g.*, Pl. Exs. 14, ECF No. 170-5) ("[Consumer Name] Has Won A Cash Prize! Respond Immediately or Risk Forfeiture!").

11.  Each mailer used fonts, graphics, and wording that appeared to come from a government agency including "SSI" or the "Office of the Director" at a law firm or financial firm. (*See, e.g.*, Pl. Exs., ECF Nos. 170-5, 170-6, 170-7, 170-8); (Pl. Exs. 37, ECF No. 170-17).

For example, mailers found on Burke's desk at his 2451 S. Buffalo Drive office included the stamp "Official Certification" with a seal for the "Property Auditor," and a purported "Award Voucher ● Payments & Transfers" form with an "Official Document" watermark printed across it. (Pl. Exs. 2, 4–5, ECF No. 170-3).  Another form letter claimed to be from "SSI" and had an official government-styled seal on it. (Pl. Supp. Exs. 17, ECF No.179-7).

12.  Other mailers used fonts and layouts similar to those used in tax forms, or looked like checks or bond certificates. (*See, e.g.*, Pl. Exs., ECF Nos. 170-5, 170-6, 170-7, 170-8).

13.  Some of the mailers had dense blocks of text on the back regarding the parameters of the contest the consumer had "won." (Pl. Exs. 28, ECF No. 170-7); (Pl. Exs. 3, 5, 8, 10, 13, 16, ECF Nos. 170-8).

14.  The mailers used many different names to identify the purported senders, including but not limited to the following examples: "Hancock Financial Services;" "Peterson & Associates;" "SSI;" "Security Services;" "Cash Award Notification;" "Access America Financial Group;" "Rushmore Financial Group;" and "Aggregate Merchants." (Pl. Exs. 6, ECF No. 170-5); (Pl. Exs. 19, ECF No. 170-7); (Pl. Exs. 2, 4, 12, 14, 17, ECF No. 170-8).

15.  If a consumer did not send money in response to a mailer, the sweepstakes operation sent an additional flier, underscoring that payment of the fee was the only remaining impediment to receiving a "life-changing" cash payout. (Pl. Exs. 7–8, ECF No. 170-7); (Pl. Exs. 43–48, ECF No. 170-17).

16.  Burke communicated with the copywriters and designers of the mailers by email. (Pl. Exs. 32–38, ECF No. 170-17); (*see also* Pl. Exs. ¶ 16, ECF No. 170-1) (FTC investigator discusses electronic documents, including Burke's emails, found on computers at his offices).

17.  Burke's emails show that he commissioned and reviewed the mailers described in paragraphs 7–15 above, overseeing the copywriting and design. (Pl. Exs. 32–48, ECF No. 170-17).

18. Burke admitted that he "consulted" on the content of the mailers. (Burke Opp'n to Pl.'s Sec. Mot. for Contempt ("Burke Opp'n") 2:26–28, 5:4–12, 10:14–19, ECF No. 186). He did not dispute the authenticity of emails that show he was involved in crafting the mailers' promises of large cash prizes. (*See, e.g.*, Pl. Exs. 35, ECF No. 170-17) (email from Burke to his copywriter that draft mailers "were a little vanilla, could stand a little more heat"); (*id*. at 37–38) (copywriter sends Burke mailer text); (*id*. at 40–41) (designer sends Burke proof of a mailer); (*id*. at 42) (Burke emails designer about editing the mailer proof); (Pl. Exs. 67, ECF No. 170-18) (email from Burke discussing "a piece I want to send out.").

19. At his deposition, Burke invoked the Fifth Amendment privilege against self-incrimination and refused to answer questions about the sweepstakes operation's mailers and his role in developing them. (Pl. Supp. Exs. 101:13–115:12, 123:5–126:20, ECF No. 179-3).

20. Burke arranged to mail the sweepstakes fliers to consumers whose information he obtained from list brokers. (Pl. Exs. 49–53, ECF No. 170-17); (Pl. Supp. Exs. 40–58, ECF No. 179-15); (Pl. Supp. Exs., ECF No. 179-19) (Professional Advertising Systems reports showing different sweepstakes lists that Glen Burke was listed as the contact for on behalf of Panama Total Marketing).

21. At Burke's direction, the brokers also generated new mailing lists of consumers who sent money in response to a previous mailer. (Pl. Supp. Exs. 40–52, ECF No. 179-15). Burke then sent those consumers further mailers—sometimes up to an additional 40 mailers—promising more payouts and seeking more money. (*See id.* at 42) (list broker writes to Burke that forty additional mailers "[s]eems like a lot, but I guess you know what your [sic] doing").

22. Burke admitted that he "facilitate[d]" the printing and mailing of the completed mailers through a company called "National Print and Mail" in Las Vegas. (Burke Opp'n 2:26–3:2, 4:16–5:3, ECF No. 186); (*see also* Receiver Decl. ¶ 5, ECF No. 167) (describing a report from Burke's QuickBooks showing transactions with "National Print and Mail"); (Pl. Exs.

26:16–27:4, ECF No. 170-23) (Burke's bookkeeper testifying that Burke received most of his income in the form of "commissions" from "National Print and Mail").

23.   Burke recruited various individuals to rent mailboxes to receive correspondence and payments consumers sent in response to the mailers. (Pl. Exs. 60–75, ECF No. 170-17).

24.   The operation used mailboxes in California, New Jersey, Pennsylvania, Illinois, Mexico, and the Netherlands, among other locations. (*E.g.*, Pl. Exs., ECF Nos. 170-5, 170-8); (Pl. Exs. 20–22, 60–75, ECF No. 170-17).

25.   Burke managed the network of mailboxes, directing their opening and closing. (Pl. Exs. 62–78, ECF No. 170-17) (including an email where an associate writes to Burke: "[W]e don't want all our eggs in one basket (box) especially when others are at the same location . . . just makes it easier to get popped for everyone."); (Tr. of Mot. for Contempt Hr'g 15:10–21, ECF No. 209).

26.   At his deposition, Burke invoked the Fifth Amendment privilege against self-incrimination and refused to answer questions about his purchase of mailing lists, work with the operation's print shop, and use of rented mailboxes. (Pl. Supp. Exs. 124:8–20, 128:10–129:11, 142:9–152:16, 154:1–155:23 ECF No. 179-3), (*but see* Pl. Supp. Exs. 1–6, ECF No. 179-8) (emails to and from Burke indicating his involvement).

27.   Sweepstakes employee Lindsay Reid testified that she was responsible for "fulfillment" of sweepstakes prizes. (Pl. Supp. Exs. 8:16–25, 20:12–23, 53:22–56:24, ECF No. 179-2) (stating that the biggest payment she sent out was $100, "probably not" every consumer that sent in a claim received a payment, and she was directed by Glen to make out checks to consumers); (*see also* Exs. in Support of Def.'s Opp'n to Pl.'s Mots. ("Def. Exs.") ¶ 19, ECF No. 188-3) (Errol Seales testified that Lindsay Reid was assigned fulfillment tasks).

28.  Reid also testified that consumers who sent checks upon receiving the sweepstakes letters, which included the language listed *supra* paragraph 8, were really "[p]urchas[ing] the booklets on how to win larger sweepstakes." (Pl. Supp. Exs. 20:1–7, ECF No. 179-2).

29.  Some consumers complained that they had not received anything after sending in their payments. (Pl. Exs. 1–4, 8–9, 11–12, ECF No. 170-5) (complaint letters); (Pl. Exs. 3–6, 170-6) (same); (Pl. Exs. 1–2, 5–6, 10–11, 14–16, 21–25, ECF No. 170-7) (same); (Pl. Supp. Exs. ¶¶ 14, 16, ECF No. 179-11) (FTC investigator describes finding files and shred bags full of complaints at 2451 S. Buffalo Drive and 3230 S. Buffalo Drive).

30.  Some consumers who complained specifically referenced the large sums they expected to receive. (*See, e.g.*, Pl. Exs. 3, ECF No. 170-5) ("On Oct. 13, 2011, I sent a check and a form back saying I had won $777,500.00. … I am still waiting for my check."); (Pl. Exs. 1, ECF No. 170-7) ("I am writing you to find out where is my Prize Award of $685,351.27?"); (*id*. at 5) ("I sent you a check for $25.97 to release my check for $685,351.27 … why have I not receive [sic] my check as of yet.").

31.  When consumers complained that they had not received the promised payouts, Burke arranged for Reid to send complainants money orders for less than $2 as their "winnings." (Pl. Exs. 4, 12–13, ECF No. 170-7) (correspondence and money order stubs for $0.79 and $1.12); (Pl. Exs. 67, ECF No. 170-18) (Burke emails copywriter that he plans to send checks for $1.12); (Pl. Supp. Exs. 29:12–25, ECF No. 179-2) (Reid testified that she sent consumers money orders for $1.12 as "fulfillments").

32.  Reid testified that she only sent consumers money on Burke's orders and with his funds. (Pl. Supp. Exs. 55:10–56:10, ECF No. 179-2).

33.  In e-mail correspondence with a copyrighter, the copyrighter asked "Are you sending everyone a small check?" Burke responded "Ya… $1.12." (Pl. Exs. 67, ECF No. 170-18); (Pl. Supp. Exs. 24, ECF No. 179-7).

34.  Burke provided a copy of an e-mail from 2009 from Eric Raskin at Professional Advertising Systems Inc. with the subject: "Winners for your sweepstakes!" which included the names, addresses, and PIN numbers for three individuals, but no prize amounts. (Def. Exs. 2, ECF No. 188-6).  At his deposition, Burke invoked the Fifth Amendment privilege against self-incrimination and refused to answer questions about his e-mail addresses. (Pl. Supp. Exs. 21:1–6, ECF No. 179-3).  Every sweepstakes mailer purported that it was a winner (*see supra* ¶ 8), so an e-mail listing three winners without any additional information or authentication (prize amounts were not listed in the e-mail for these winners) does not legitimize the sweepstakes operation.

35.  Burke further proffered two purported "cashier check copies for winners." (Def. Exs. 2–3, ECF No. 188-7).  Burke failed to provide any foundation to establish that these checks were sent to consumers related to the sweepstakes.  However, even if these documents were admissible, both fall far short of the sums promised in Burke's mailers. (Def. Exs. 2–3, ECF No. 188-7).  There is thus no dispute that neither Burke nor anyone else who worked for the sweepstakes operation ever sent the promised prizes.

36.  Burke admitted that "the odds of a large award was [sic] very slim." (Burke Opp'n 8:25–27, ECF No. 186).

37.  At his deposition, Burke invoked the Fifth Amendment privilege against self-incrimination and refused to answer questions about the sweepstakes operation's "fulfillment" and his role in it. (Pl. Supp. Exs. 129:13–140:7, ECF No. 179-3).

38.  Burke admitted that he consulted on the content of the mailers, managed printing services, and leased the operation's premises and equipment. (Burke Opp'n 2, 5, 10, ECF No. 186).

39.  Burke admitted that he managed payment processing for the sweepstakes operation and used his own credit cards and accounts to pay vendors and employees. (Burke Opp'n 4:16–5:3, ECF No. 186).

40.  Burke admitted that the sweepstakes business, which included printing and "fulfillment," operated from Burke's offices in Las Vegas. (Burke Opp'n 4, 6–7, ECF No. 186).

41.  While Burke asserts that Errol Seales is the sweepstakes operation's owner, Burke nonetheless did not dispute Reid's testimony that she approached Burke, not Seales, with questions and concerns about the sweepstakes business. (Burke Opp'n 6:26–7:1, 7:13–14,  ECF No. 186); (Pl. Supp. Exs. 25:10–26:9, 39:13–40:19, 42:7–17, 47:5–48:8, 50:15–51:7, ECF No. 179-2).

42.  Reid testified that she sent Burke, not Seales, weekly reports about the sweepstakes business, titled "weekly report for Glen." (Pl. Supp. Exs. 64, ECF No. 179-2).

43.  Reid further testified that she did not even have a way to contact Seales, nor did she request contact information for him. (Pl. Supp. Exs. 48:2–8, ECF No. 179-2).

44.  While Seales' name was on invoices for the operation's mailbox in the Netherlands, the mailbox manager communicated exclusively with Burke. (Pl. Exs. 2–5, 9–13, ECF No. 170-17).

45.  In one instance, a package containing $12,000 cash that the Netherlands contact sent Burke broke in transit, leading to inquiries from U.S. Customs and the FBI. (Pl. Exs. 23–28, ECF No. 170-17).  This prompted Burke and an associate to discuss how the Netherlands contact could keep Burke's name out of the investigation despite his oversight of that mailbox. (*Id*. at 23) (associate suggests sending the Netherlands contact the following email: "I do believe some caution needs to be taken if you have to deal with US authorities. Regardless of who you have interaction with on a day to day [sic] basis you should be very careful if you are

asked who the client is and only give the information used for billing . . . (for example, Glen [Burke] is only a consultant, Errol [Seales] is the principal).")

46.  Similarly, although Seales' name was on accounts with the sweepstakes operation's payment processor, Burke admits that he controlled disbursements from those accounts. (Burke Opp'n 4:16–5:3, ECF No. 186); (*see also* Pl. Exs. 6–8, ECF No. 170-17); (Pl. Supp. Exs. ¶¶ 6–9, ECF No. 179-10); (Pl. Supp. Exs. 66–69, ECF No. 179-15).

47.  At his deposition, Burke invoked the Fifth Amendment privilege against self-incrimination and refused to answer questions about his role in the sweepstakes operation (*supra* ¶¶ 18, 25, 33), and his relationship with Seales. (Pl. Supp. Exs. 152:25–153:25, 155:24–161:5, ECF No. 179-3); (Pl. Supp. Exs. 7–11, ECF Nos. 179-8) (emails between Burke and Seales).

48.  Most of the money that consumers sent in response to the mailers arrived in checks and money orders made out to the fictitious businesses named on the mailers. (*E.g.*, Pl. Exs. 18–27, ECF No. 170-8) (checks found on Burke's desk); (Pl. Supp. Exs. 16:19–18:2, 19:1–10, 20:1–21, ECF No. 179-2).

49.  Burke deposited some of these checks into overseas accounts, but he processed the majority of the checks through a foreign check processor. (Pl. Exs. 14–22, ECF No. 170-17) (deposits into bank accounts); (Pl. Supp. Exs. ¶¶ 5–7, ECF No. 179-10).

50.  The foreign check processor electronically deposited consumers' payments and disbursed the funds under Burke's orders. (Receiver Decl. ¶¶ 4–5, ECF No. 167); (Pl. Supp. Exs. ¶¶ 3–7, ECF No. 179-10).

51.  In one instance, Burke secured an overseas bank's willingness to process hundreds of checks per day by paying a $2,000 "required gift." (Pl. Exs. 14–16, ECF No. 170-17).

52.  Burke paid expenses for the sweepstakes operation by directing the check processor to wire money to the operation's copywriters, list brokers, print shop, and mailbox managers.

(Receiver Decl. ¶ 5, ECF No. 167); (Pl. Exs. 6–8, ECF No. 170-17); (Pl. Supp. Exs. ¶ 7, ECF No. 179-10).

53.   Burke also directed the check processor to wire money in large, round increments to the print shop, National Print and Mail, which then issued checks for the wired funds to Burke's company, Merchant's Depot. (Receiver Decl. ¶ 5, ECF No. 167).

54.   Since 2007, the foreign check processor has credited a total of $17,576,927 in checks from consumers to the sweepstakes operation's accounts. (Pl. Supp. Exs. ¶¶ 9–13, ECF No. 179-10).

55.   On average, 90 percent of the operation's proceeds arrived by check or money order, and at least 10 percent arrived in cash. (*See* Pl. Supp. Exs. 70–71, ECF No. 179-15); (Receiver's Second Report 12 n. 4, ECF No. 177).

56.   Based on the fact that $17,576,927 in checks were deposited, (Pl. Supp. Exs. ¶¶ 9–13, ECF No. 179-10), and given the 90%-to-10% check-to-cash ratio, the operation therefore received at least an additional $1,952,992 in cash since 2007.

57.   In total, the sweepstakes operation received $19,529,919 from consumers.

58.   The check processor's records show that, between refunds to consumers and bounced checks, $2,140,687 was returned to consumers from the operation's accounts and should be deducted from the total. (Pl. Supp. Exs. ¶¶ 8–13, ECF No. 179-10).

59.   Thus, the sweepstakes operation netted at least $17,389,232.

60.   At his deposition, Burke invoked the Fifth Amendment privilege against self-incrimination and refused to answer questions about the sweepstakes operation's finances. (Pl. Supp. Exs. 162:12–173:4 ECF No. 179-3); (Pl. Supp. Exs. 12–34, ECF No. 179-8) (foreign check processor's transactions list); (Pl. Supp. Exs. 1–5; ECF Nos. 179-9) (emails from Burke discussing finances).

## II.   CONCLUSIONS OF LAW

61.  The court has jurisdiction pursuant to 28 U.S.C. § 1331.

62.  This court has power under 18 U.S.C. § 401(3) to punish contempt of its authority. "The proof for civil contempt must be clear and convincing—a higher standard than the preponderance of the evidence standard but less stringent than beyond a reasonable doubt." *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989).

63.  Once the movant provides evidence sufficient to meet its clear and convincing burden, the burden shifts to the contemnors to demonstrate why they were unable to comply. *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983).  The contemnor must show they took every reasonable step to comply with the court order. *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976).  "Substantial compliance with a court order is a defense to an action for civil contempt." *Balla*, 869 F.2d at 466.

64.  "Intent is irrelevant to a finding of civil contempt and, therefore, good faith is not a defense." *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992).

65.  Upon receipt of actual notice, an injunction order binds the parties, their agents, and any other person that acts in "active concert or participation" with a party or party's agent. Fed. R. Civ. P. 65(d)(2).

66.  Burke is a party to the Order and stipulated to its entry, so he is bound by its prohibitions, as he admits. (*See* Order 16, ECF No. 122); (Def's Opp'n to Pl.'s Mot. for Contempt 2, ECF No. 185); (Findings of Fact ("FOF") ¶¶ 1–3).  The Order prohibited Burke from "**misrepresenting**, in any manner, directly or by implication, or failing to disclose any fact **material** to a consumer's decision to purchase any item, product, good, service, or investment" or likely profits to be made by an investment. (Order 5:1–2, 8–9 ECF No. 122) (emphasis added).  Burke was also ordered to not assist others in any of these endeavors. (Order 5:22 ECF No. 122).

67.  As described above in the findings of facts, the representations in the sweepstakes mailers promised consumers they would receive payouts ranging from tens of thousands to millions of dollars. (*See* FOF ¶ 8).  The mailers' repeated references to large sums of money, and effusive congratulations for the recipients, created the impression that the individual consumer who received the mailer would receive the entire listed payout. (*Id.*).  The follow-up fliers sent to consumers who did not respond initially further underscored that the promised prize was "life-changing." (*Id.* ¶ 15).

68.  Dense, hard-to-read "disclosure" text on the backs of otherwise deceptive mailers does not render the mailers non-deceptive. *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200–01 (9th Cir. 2006) (holding that mailers purporting to be checks with small-print disclosures on the back were deceptive as a matter of law); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1220–21 (D. Nev. 2011) (same, with respect to disclosures in small print on websites) *aff'd in part, vacated on other grounds by* 763 F.3d 1094 (9th Cir. 2014).

69.  Even if consumers read the "disclosures," the text failed to clarify that consumers would not receive the full amount listed on the front of the mailer, instead reiterating that the consumer was "entitled" to receive a "prize" that may be thousands of dollars. (FOF ¶ 8).

70.  Complaints found in Burke's offices show that consumers who received the mailers did, in fact, believe that they had already been selected to receive the full amount listed on the face of the mailers. (FOF ¶¶ 29–31).

71.  Burke worked with copywriters and designers to craft the representations and select fonts, graphic designs, fictitious names, headings, and signatures to convince recipients the letters came from law firms, financial services firms, or government agencies. (FOF ¶¶ 11–14, 16–18).

72.  Burke was responsible for having the representations printed and mailed to consumers. (FOF ¶¶ 20–25).  Burke, therefore, "made" the representations to consumers or assisted in the creation of items for marketing. (*Id.*).

73.  Burke's representations about the payouts and their sources were "material" because they were both expressly made and concerned the very nature of the benefits consumers expected to receive. *See FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (finding that representations about the nature of the benefit were material); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095–96 (9th Cir. 1994) ("Express claims are presumed to be material"); *FTC v. Figgie Int'l*, 994 F.2d 595, 603–04 (9th Cir. 1993) (misrepresentation about benefit product offered concerned "the single most useful piece of information" consumers could receive, and misrepresentation was material).

74.  Furthermore, the representations convinced consumers to pay administrative fees for Burke's "services"—ostensibly, the fulfillment of a sweepstakes prize. (FOF ¶¶ 9, 31).  The representations were therefore material to the "consumer's decision to purchase … [a] service." (*See* FOF ¶ 2).

75.  In reality, no consumer ever received the promised payouts. (FOF ¶¶ 29–36).  Instead, consumers received booklets about how to enter sweepstakes and, in some instances, money orders for less than $2. (*Id.*).

76.  Burke therefore made misrepresentations material to consumers' decisions to purchase services, in violation of the Order. (*See* FOF ¶¶ 1–2).

77.  Burke asserts that Errol Seales was the owner of the sweepstakes operation, and Burke was merely a "consultant" to Seales. (Burke Opp'n 4–5, ECF No. 186); (Def. Exs. 2–4, ECF No. 188-3) (Seales affidavit).  Even assuming this assertion about the operation's ownership and hierarchy is true, the evidence shows Burke played a crucial role in the key aspects of the sweepstakes operation, including the creation and dissemination of deceptive

mailers. (FOF ¶¶ 16–18, 20–22, 31).  At the very least, then, he "assisted another" to make these misrepresentations, which was sufficient to violate the Order. (*See* FOF ¶ 2).

78.  Additionally, Burke's involvement in crafting the misrepresentations and sending them to consumers make him liable for contempt, even if he ultimately answered to another.  A party bound by an order must "take all reasonable steps within [his] power to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).  As such, Burke cannot evade liability for his actions by claiming that he was just following orders.

79.  Even assuming Burke was a "consultant" to Seales rather than the operation's owner, the evidence demonstrates Burke managed the day-to-day aspects of the sweepstakes operation and is responsible for its misrepresentations to consumers. (*See* FOF ¶¶ 5–60).

80.  When a defendant in a civil case refuses to answer questions based upon his Fifth Amendment privilege against self-incrimination, the court may draw an adverse inference regarding any point on which he refused to testify. *See Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911–12 (9th Cir. 2008); *see also Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264–65 (9th Cir. 2000); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998).  However, "the [adverse] inference may be drawn only when there is independent evidence of the fact about which the party refuses to testify." *Richards*, 541 F.3d at 912.

81.  As described above, Burke took the Fifth Amendment on every issue relevant to this contempt, including: his stipulation to the Order; the deceptive representations he made to consumers; his failure to deliver the promised prizes; and the amount of consumer harm resulting from his violations. (*See* FOF ¶¶ 19, 26, 34, 37, 47, 60).

82.  As the FTC has presented independent evidence to corroborate each of these points (*see generally* FOF ¶¶ 1–60), the Court draws adverse inferences on all points to support a finding of contempt and an order to pay compensatory sanctions.

83.  In civil contempt actions, the Court imposes monetary liability if the contemnor's violations caused losses, without regard to the contemnor's state of mind. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("Since the purpose [of civil contempt] is remedial, it matters not with what intent the defendant did the prohibited act.").  The knowledge-based standard for imposing monetary liability on an individual in a new action under the Federal Trade Commission Act is therefore inapplicable. *Compare FTC v. Publ'g Clearing House, Inc*., 104 F.3d 1168, 1171 (9th Cir. 1997) (requiring knowledge to impose monetary liability under the Federal Trade Commission Act) *with McComb*, 336 U.S. at 191 (for civil contempt liability, the contemnor's state of mind is irrelevant).

84.  The measure of compensatory sanctions must be proven by a preponderance of the evidence, not by clear and convincing evidence. *FTC v. Kuykendall*, 371 F.3d 745, 751 (10th Cir. 2004); *McGregor v. Chierico*, 206 F.3d 1378, 1387 (11th Cir. 2000); *In re Gen. Motors Corp*., 110 F.3d 1003, 1018 (4th Cir. 1997); *see also Ahearn ex rel. NLRB v. Int'l Longshore & Warehouse Union*, 721 F.3d 1122, 1129 n. 3 (9th Cir. 2013) (recognizing in dicta that every circuit court to have considered the standard of proof for compensatory contempt sanctions has adopted a preponderance standard).

85.  In an FTC contempt action, consumer loss is an appropriate measure of the compensatory remedy. *EDebitPay*, 695 F.3d at 945.  However, the Ninth Circuit directed that "[i]n exercising this discretion, the district court should explain why the use of consumer loss is appropriate and why the remedy is commensurate with the harm." *Id*.

86.  In this case, the FTC has demonstrated that it would have a difficult time proving Burke's net gain, especially given his noncooperation. (Reply to Def.'s Response to Prelim. Inj. 3–6, ECF No. 168).  He violated this Court's injunction by participating in the sweepstakes operation. (*See* FOF ¶¶ 5–60).  Further, the consumer loss totals the full amount consumers paid, minus refunds already provided to complaining consumers. (*See* FOF ¶¶ 54–60).  As

described above, Burke's sweepstakes operation cost consumers at least $17,389,232 when refunds were subtracted from the total. (*Id.*).  The Court finds that full restitution, or making as many deceived consumers as whole as possible, is appropriate here because Burke disregarded the core provisions of the Order not to mislead consumers. *See EDebitPay*, 695 F.3d at 945.

87.  The Court will not limit the recovery to Burke's profits from the scheme.  Such a measure would fall short of consumer loss and thus would not constitute a full compensatory remedy. *See id.* (the Ninth Circuit refused to impose profit-based limits in FTC contempt case).

88.  Furthermore, no offset is warranted for any "value" in the sweepstakes booklets or *de minimis* checks sent to some consumers, as the victims paid based on false promises about valuable monetary prizes. *See Figgie*, 994 F.2d at 606 (consumers enticed by false promises are entitled to full refunds regardless of the value of merchandise received because they are injured by "the fraud in the selling"); *see also FTC v. Trudeau*, 579 F.3d 754, 773 n. 16 (7th Cir. 2009) (applying *Figgie* in measuring contempt sanctions); *Kuykendall*, 371 F.3d at 765–66 (same); *McGregor*, 206 F.3d at 1388–89 (same).

89.  As described above, Burke violated the Order's prohibition on material misrepresentations, and his misrepresentations caused at least $17,389,232 in consumer harm. (FOF ¶¶ 54–60).  Accordingly, Burke is liable for $17,389,232 in compensatory sanctions related to the direct-mail sweepstakes operation.

90.  When there are no genuine issues of material fact to try, courts need not hold an evidentiary hearing before ruling on a motion for contempt. *See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998); *Thomas, Head & Greisen Emps. Trust v. Buster*, 95 F.3d 1449, 1458–59 (9th Cir. 1996).  Thus, although the court "should not impose contempt sanctions solely on the basis of affidavits," it may base a finding of contempt on the affidavits if they are uncontroverted. *Peterson*, 140 F.3d at 1324.  The requirements of due process are met as long as the defendants have ample notice and an opportunity to respond to the

possibility that the court will find them in contempt. *Buster*, 95 F.3d at 1458 (due process is satisfied where defendant submits briefing in response to a motion for contempt).

91.  Here, uncontroverted documentary evidence and affidavits, along with Burke's own admissions, establish Burke's liability and the proper scope of compensatory sanctions.

92.  The evidence relied upon herein is sufficient to grant judgment without an evidentiary hearing. *Cf. Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (summary judgment may be granted based on admissible evidence).

93.  In Burke's responses to the FTC's contempt motions, he has not contested the validity or admissibility of any of the evidence relied upon in this ruling.

94.  Finally, a defendant's assertion of the Fifth Amendment privilege against self-incrimination prevents him from testifying, after the close of discovery, on points on which he previously refused to testify. *See, e.g.*, *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910 (9th Cir. 2008); *cf. United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 641–42 (9th Cir. 2012).  Burke's assertion of his Fifth Amendment privilege prevents him from testifying about his actions in the direct-mail sweepstakes operation or the amount of harm his actions caused, which are the only facts material to this case.

95.  Accordingly, the Court need not hold an evidentiary hearing before ruling on the FTC's First and Second Contempt Motions, as no material facts are in dispute.

## **CONCLUSION**

**IT IS HEREBY ORDERED** that Glen Burke is found in contempt of the Order for his involvement in the direct-mail sweepstakes operation described above.  The Court orders Burke to pay contempt sanctions in the amount of $17,389,232.

**DATED** this ___16___ day of March, 2016.

_____
Gloria M. Navarro, Chief Judge
United States District Judge